UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JAY BRADSHAW,

                              Plaintiff,

               v.                                                    9:23-CV-0602
                                                                     (MAD/ML)
ANTHONY ANNUCCI, et al.,

                              Defendants.

_____

APPEARANCES:

JAY BRADSHAW
08-A-3654
Plaintiff, pro se
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821


MAE A. D'AGOSTINO
United States District Judge

## DECISION and ORDER

## I.     INTRODUCTION

        Pro se plaintiff Jay Bradshaw commenced this action by filing a complaint asserting

claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an application to

proceed in forma pauperis ("IFP"), and a request for preliminary injunctive relief.  Dkt. No. 1

("Compl."); Dkt. No. 2 ("IFP Application"); Dkt. No. 4 ("Preliminary Injunction Motion").[1]

Plaintiff, who is incarcerated at Great Meadow Correctional Facility, has not paid the filing fee

_____

        [1]  The complaint was also accompanied by an application seeking leave to commence a new civil action
in this District as required by the Pre-Filing Order entered by the Honorable Glenn T. Suddaby on March 3, 2022.
*See In re: Bradshaw*, No. 9:21-PF-0002 (GTS), Dkt. No. 4.  By Decision and Order entered on May 18, 2023, the
Honorable Brenda K. Sannes granted plaintiff's application to commence this action.  *Id.*, Dkt. No. 10.

for this action.

## II.    IFP STATUS

Where a plaintiff seeks leave to proceed IFP, the Court must determine whether the

plaintiff has demonstrated sufficient economic need to proceed without prepaying, in full, the

Court's filing fee of four hundred and two dollars ($402.00).[2]  The Court must also determine

whether the "three strikes" provision of 28 U.S.C. § 1915(g) ("Section 1915(g)") bars the

plaintiff from proceeding IFP and without prepayment of the filing fee.[3]  More specifically,

Section 1915(g) provides as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment
> in a civil action or proceeding under this section if the prisoner has,
> on 3 or more prior occasions, while incarcerated or detained in any
> facility, brought an action or appeal in a court of the United States
> that was dismissed on the grounds that it is frivolous, malicious, or
> fails to state a claim upon which relief may be granted, unless the
> prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).  If the plaintiff is indigent and not barred by Section 1915(g), the Court

must consider the sufficiency of the claims stated in the complaint in accordance with 28

U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

In this case, plaintiff has demonstrated economic need through his IFP Application,

and has filed the inmate authorization form required in the Northern District of New York.

---

[2]  "28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).  "Although an indigent, incarcerated individual need not prepay the filing fee . . . at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

[3]  The manifest intent of Congress in enacting Section 1915(g) was to curb prison inmate abuses and to deter the filing of multiple, frivolous civil rights suits by prison inmates.  *Tafari v. Hues*, 473 F.3d 440, 443-44 (2d Cir. 2007).  The question of whether a prior dismissal is a "strike" is a matter of statutory interpretation and, as such, is a question for the court to determine as a matter of law.  *Tafari*, 473 F.3d at 442-43.

*See* Dkt. Nos. 2, 3.  Thus, the Court must determine whether the "three strikes" rule of Section 1915(g) bars plaintiff from proceeding with this action IFP.

### A.    Determination of "Strikes"

Plaintiff is a frequent litigator, having commenced, in addition to this action, at least twenty-five previously filed civil actions in the district courts in the Second Circuit since 2008. *See* PACER Case Locator <https://pcl.uscourts.gov/pcl/pages/search/findParty.jsf> (last visited July 18, 2023).  The following is a list of those actions: (1) *Bradshaw v. McQueen*, No. 08-CV-5518 (S.D.N.Y. filed June 18, 2008); (2) *Bradshaw v. Officer Banks*, No. 09-CV-0966 (S.D.N.Y. filed Feb. 4, 2009); (3) *Bradshaw v. Brown*, No. 13-CV-4308 (E.D.N.Y. filed July 31, 2013); (4) *Bradshaw v. The City of New York*, No. 15-CV-2166 (E.D.N.Y. filed Apr. 13, 2015); (5) *Bradshaw v. The City of New York*, No. 15-CV-4638 (S.D.N.Y. filed June 10, 2015); (6) *Bradshaw v. The City of New York*, No. 15-CV-5481 (S.D.N.Y. filed July 10, 2015); (7) *Bradshaw v. The City of New York*, No. 15-CV-7074 (S.D.N.Y. filed Sept. 8, 2015); (8) *Bradshaw v. The City of New York*, No. 15-CV-8252 (S.D.N.Y. filed Oct. 20, 2015); (9) *Bradshaw v. The City of New York*, No. 15-CV-9031 (S.D.N.Y. Nov. 17, 2015); (10) *Bradshaw v. The City of New York*, No. 17-CV-1199 (S.D.N.Y. filed Feb. 16, 2017); (11) *Bradshaw v. The City of New York*, No. 17-CV-1168 (E.D.N.Y. filed Feb. 27, 2017); (12) *Bradshaw v. The City of New York*, No. 18-CV-8215 (S.D.N.Y. filed Sept. 7, 2018) ("*Bradshaw v. The City of New York IX*"); (13) *Bradshaw v. Locke*, No. 19-CV-428 (N.D.N.Y. filed April 10, 2019) ("*Bradshaw v. Locke*"); (14) *Bradshaw v. Burns*, No. 19-CV-931 (N.D.N.Y. filed July 31, 2019) ("*Bradshaw v. Burns*"); (15) *Bradshaw v. Annucci*, No. 20-CV-6083 (W.D.N.Y. filed Feb. 6, 2020); (16) *Bradshaw v. Piccolo*, No. 20-CV-6106

(W.D.N.Y. Feb. 18, 2020); (17) *Bradshaw v. Piccolo*, No. 20-CV-6368 (W.D.N.Y. filed June 4, 2020); (18) *Bradshaw v. Annucci*, No. 20-CV-6548 (W.D.N.Y. Sept. 29, 2020); (19) *Bradshaw v. Piccolo*, No. 21-CV-6050 (W.D.N.Y. filed Jan. 19, 2021); (20) *Bradshaw v. Gordon*, No. 21-CV-0645 (N.D.N.Y. filed June 3, 2021) ("*Bradshaw v. Gordon*"); (21) *Bradshaw v. Uhler*, No. 21-CV-0776 (N.D.N.Y. filed July 8, 2021) ("*Bradshaw v. Uhler*"); and (22) *Bradshaw v. Marshal*, No. 21-CV-0826 (N.D.N.Y. filed July 21, 2021) ("*Bradshaw v. Marshal*"); (23) *Bradshaw v. Annucci*, No. 21-CV-0901 (N.D.N.Y. filed Aug. 11, 2021) ("*Bradshaw v. Annucci*"); (24) *Bradshaw v. Brand*, No. 21-CV-0942 (N.D.N.Y. filed Aug. 20, 2021) ("*Bradshaw v. Brand*"); and (25) *Bradshaw v. Bishop*, No. 22-CV-0094 (GTS/ML) (N.D.N.Y. filed Feb. 2, 2022) ("*Bradshaw v. Bishop*").[4]

Upon review of these actions, and consistent with the determinations reached by the Honorable Brenda K. Sannes in *Bradshaw v. Locke* and *Bradshaw v. Burns*, by the Honorable Glenn T. Suddaby in *Bradshaw v. Gordon* and *Bradshaw v. Uhler*, and by this Court in *Bradshaw v. Marshal*, this Court once again finds that, as of the date that plaintiff commenced this action, he had acquired at least four "strikes."[5] As a result, plaintiff's IFP

---

[4] *Bradshaw v. Locke, Bradshaw v. Marshall,* and *Bradshaw v. Annucci* are all currently pending in this District. On December 3, 2021, judgment was entered in *Bradshaw v. Brand* dismissing the action without prejudice based on plaintiff's failure to comply with the filing fee requirement. *Id.*, Dkt. No. 6. On February 18, 2022, plaintiff's IFP status was revoked in *Bradshaw v. Gordon* and *Bradshaw v. Uhler*, and those actions were later dismissed without prejudice based on plaintiff's failure to comply with the filing fee requirement. *See Bradshaw v. Gordon*, Dkt. Nos. 67, 75; *Bradshaw v. Uhler*, Dkt. Nos. 72, 81. On April 28, 2023, judgment was entered in *Bradshaw v. Bishop* dismissing the action without prejudice based on plaintiff's failure to comply with the filing fee requirement. *Id.*, Dkt. No. 27.

[5] The actions in which plaintiff acquired strikes are as follows: (1) *Bradshaw v. McQueen*, No. 08-CV-5518, Dkt. No. 32 (S.D.N.Y. Feb. 11, 2010) (dismissing complaint for failure to state a claim upon which relief may be granted); (2) *Bradshaw v. Brown*, No. 13-CV-4308, Dkt. No. 52 (E.D.N.Y. May 18, 2017) (Mandate dismissing appeal of dismissal order on grounds that it lacked "an arguable basis either in law or in fact"); (3) *Bradshaw v. The City of New York*, No. 15-CV-2166, Dkt. No. 58 (E.D.N.Y. Aug. 22, 2017) (dismissing complaint for failure to state a claim upon which relief may be granted); (4) *Bradshaw v. The City of New York*, No.

(continued...)

Application must be denied unless it appears that the "imminent danger" exception to the "three strikes" rule set forth in Section 1915(g) is applicable to this action.

## B.    Applicability of the "Imminent Danger" Exception

The "imminent danger" exception protects a prison inmate exposed to potential serious physical injury from the consequences of his earlier mistakes in filing frivolous litigation.  Generally speaking, the allegations relevant to this inquiry "are those in which [plaintiff] describes physical injury, threats of violence, and deprivation of medical treatment." *Chavis v. Chappius*, 618 F.3d 162, 165 (2d Cir. 2010).  The Second Circuit has described the nature of the Court's inquiry regarding imminent danger as follows: "although the feared physical injury must be serious, we should not make an overly detailed inquiry into whether the allegations qualify for the exception, because § 1915(g) concerns only a threshold procedural question, while [s]eparate PLRA provisions are directed at screening out meritless suits early on." *Id*. at 169-70 (*quoting Andrews v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007)) (internal quotation marks omitted).

"[F]or a prisoner to qualify for the imminent danger exception, the danger must be present when he files his complaint – in other words, a three-strikes litigant is not excepted from the filing fee if he alleges a danger that has dissipated by the time a complaint is filed." *Pettus v. Morgenthau*, 554 F.3d 293, 296 (2d Cir. 2009); *see also Polanco v. Hopkins*, 510 F.3d 152 (2d Cir. 2007); *Akassy v. Hardy*, 887 F.3d 91, 96 (2d Cir. 2018).  However, "allegations of past violence can satisfy the imminent danger exception when, for example,

---

[5](...continued)
15-CV-2166, Dkt. No. 62 (E.D.N.Y. Nov. 16, 2018) (Mandate dismissing appeal on grounds that it lacked "an arguable basis either in law or in fact").  In *Bradshaw v. Locke*, Judge Sannes specifically discussed each of these four "strikes" in her initial Decision and Order entered on May 9, 2019.  *See id.*, Dkt. No. 8.

the past harms are part of an ongoing pattern of acts." *Carter v. New York State*, No.

20-CV-5955, 2020 WL 4700902, at *1 (S.D.N.Y. Aug. 12, 2020) (citing *Chavis*, 618 F.3d at

170 (holding that "[a]n allegation of a recent brutal beating, combined with three separate

threatening incidents, some of which involved officers who purportedly participated in that

beating, is clearly the sort of ongoing pattern of acts that satisfies the imminent danger

exception.")).

In addition, "§ 1915(g) allows a three-strikes litigant to proceed [IFP] only when there

exists an adequate nexus between the claims he seeks to pursue and the imminent danger

he alleges." *Pettus*, 554 F.3d at 296.  In deciding whether such a nexus exists, the Second

Circuit has instructed the courts to consider "(1) whether the imminent danger of serious

physical injury that a three-strikes litigant alleges is fairly traceable to unlawful conduct

asserted in the complaint, and (2) whether a favorable judicial outcome would redress that

injury." *Id*. at 298-99.

In this case, the complaint alleges that at the time of filing, plaintiff had been

continuously confined in the Residential Rehabilitation Unit ("RRU") for one year, where he

was scheduled to remain housed for at least an additional year.  Compl., ¶¶ 221, 233, 248,

259-260, 303.  The complaint further alleges that plaintiff is confined in his cell for all but two

hours each day, and had not received, throughout the year that he was confined in the RRU,

an individual rehabilitation plan or private mental health therapy, despite a history of self-

harm and ongoing anxiety and depression associated with his confinement status.  *Id.*, ¶¶

307-313, 332-340.  The complaint also identifies several incidents of plaintiff being assaulted

by other inmates, alleges that he is likely to be harmed in the future if he continues to be

placed in a double-bunk cell, and further alleges that he was informed three days before the

complaint was filed that he would be placed in a double-bunk cell "as soon as possible." *Id.*, ¶¶ 96-179.

At this stage of the proceeding, the Court finds that the allegations in the complaint plausibly suggest that plaintiff was "under imminent danger of serious physical injury" when he signed his complaint on April 17, 2023. *See, e.g., Lindsey v. Hoem*, 799 Fed. App'x 410, 412 (7th Cir. 2020) ("Lindsey's first complaint alleges that prison staff have placed Lindsey in danger of imminent physical harm by failing to treat his PTSD. Suicidal ideation and a risk of self-harm, particularly for a mentally ill prisoner like Lindsey in prolonged segregation, satisfy the statutory imminent-danger exception that the court adopted in its sanction order." (citing, *inter alia*, *Sanders v. Melvin*, 873 F.3d 957, 960 (7th Cir. 2017)); *Abreu v. Lira*, No. 12-CV-1385 (NAM/DEP), Dkt. No. 5 (N.D.N.Y. Feb. 28, 2013) (granting "three strikes" plaintiff leave to proceed in forma pauperis, finding that plaintiff's allegations that he was "denied adequate medical care for his serious medical and mental health needs at Upstate Correctional Facility" were sufficient to plausibly suggest that he was "under imminent danger of serious physical injury" when the action was filed). Thus, plaintiff is granted leave to proceed IFP in this action.

The Court notes that this is a preliminary finding which defendants are entitled to challenge or refute in future filings. Thus, plaintiff's IFP status will be revoked if, as the case progresses, it is determined that he did not face "imminent danger" when he commenced this action or is otherwise not entitled to proceed IFP.

## III.     INITIAL REVIEW OF THE COMPLAINT

### A.     Governing Legal Standard

Having found that plaintiff meets the financial criteria for commencing this action IFP, and because he seeks relief from officers and employees of governmental entities, the Court must now consider the sufficiency of the allegations set forth in his complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.

Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "(2) . . . the court shall dismiss the case at any time if the court determines that – . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. §1915(e). Similarly, Section 1915A directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that Sections 1915(e) and 1915A are available to evaluate prisoner pro se complaints).

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") provides that a pleading which sets forth a claim for relief shall contain, inter alia, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).  Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Thus, although the court has the duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to

respond," *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted), the court also has a responsibility to determine whether plaintiff may properly proceed with this action.

### B.     Summary of the Complaint

Plaintiff asserts allegations of wrongdoing that occurred while he was incarcerated at Upstate Correctional Facility ("Upstate C.F."), in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").

The forty-five (45) page handwritten complaint, which is generally organized by claim, alleges that on multiple occasions between June, 2021 and April, 2023, corrections officials subjected plaintiff to unnecessary force, failed to protect him from assaults by other inmates, issued him false misbehavior reports that resulted in excessive restrictive confinement, deprived him of constitutionally adequate conditions-of-confinement, denied him access to mental health treatment, interfered with his mail, subjected him to retaliatory cell searches, and deprived him of personal property. *See generally*, Compl.  The following facts are set forth as alleged by plaintiff in his complaint.

### 1. Use-of-Force Incidents Involving Corrections Officials

The complaint identifies the following use-of-force incidents involving corrections officials: (1) defendant Corrections Officer Osborn "maliciously slamm[ing] plaintiff's hand in the cell hatch on June 18, 2021[,]" Compl., ¶ 16 (hereinafter, "the First Assault"); (2) defendant Corrections Sergeant John Doe #1 forcibly pressing plaintiff into a wall while handcuffed, despite plaintiff's complaints of pain, on June 24, 2021, Compl., ¶ 17 (hereinafter, "the Second Assault"); (3) defendant Corrections Officer Phillips "slamm[ing]"

plaintiff to the floor of his cell and placing him in a "choke hold" while defendant Corrections Officer Tyler "searched plaintiff's anal cavity for contraband" on July 1, 2021, Compl., ¶¶ 19-22 (hereinafter, "the Third Assault"); (4) defendant Osborn "intentionally and maliciously slamm[ing] plaintiff's hand with the cell door hatch" on September 27, 2021, Compl., ¶ 31 (hereinafter, "the Fourth Assault"); (5) defendant Corrections Officer Menard "intentionally and maliciously slamm[ing] plaintiff's hand with the cell door hatch" on December 5, 2021, Compl., ¶ 37 (hereinafter, "the Fifth Assault"); (6) defendant Corrections Officer Bailey "grab[bing]" plaintiff by the back of his coat and twisting his waist shackles while exiting a bus on December 20, 2021, and Bailey and defendant Corrections Officer Trombley thereafter pushing plaintiff and squeezing his handcuffs during the escort back to his cell, in the presence of defendant Corrections Sergeant Cymbrak, Compl., ¶¶ 40-42 (hereinafter, "the Sixth Assault"); (7) defendant Corrections Officers Mitchell and Chase punching plaintiff in his cell and defendant Corrections Sergeant Marshall spraying plaintiff in the eyes with a foreign substance on January 30, 2022, while defendant Corrections Lieutenant Gettman, Corrections Officer Morrison, and Corrections Sergeant John Doe #2 stood by, Compl., ¶¶ 56-60 (hereinafter, "the Seventh Assault"); (8) defendant Corrections Officer John Doe #3 tightening plaintiff's handcuffs and slamming him into a wall, and defendant Osborn pushing plaintiff into a wall during an escort on April 30, 2022, Compl., ¶¶ 71-73 (hereinafter, "the Eighth Assault"); (9) defendant Osborn threatening plaintiff with harm, defendants Gettman, Corrections Sergeant Plonka, and Corrections Captain Gravlin disregarding the reported threat, defendants Osborn and Corrections Officer Robare thereafter macing and restraining plaintiff in his cell, and defendants Osborn and Corrections Officer Carter assaulting plaintiff in a different cell, in the presence of defendants Plonka and Corrections Officer John Doe #4,

11

on December 12, 2022, Compl., ¶¶ 76-84 (hereinafter, "the Ninth Assault").

The complaint also alleges that (1) defendant Osborn initiated the First Assault in retaliation for plaintiff filing a grievance, Compl., ¶ 16, (2) defendant Corrections Officer Hooper, defendant Corrections Sergeant McGee, and defendant Phillips each authored false reports regarding the Third Assault in an effort to "conceal" the wrongdoing, Compl., ¶¶ 23, (3) defendant Menard initiated the Fifth Assault in retaliation for plaintiff filing a grievance, Compl., ¶ 37, (4) defendant Trombley participated in the Sixth Assault in retaliation for plaintiff filing a lawsuit against him, Compl., ¶ 43, (5) defendants Bailey and Trombley engaged in retaliatory acts of intimidation against plaintiff following the Sixth Assault, Compl., ¶¶ 46-50, (6) defendant Marshall directed "retaliatory search[es]" of plaintiff's cell on January 6 and January 30, 2022, prior to the Seventh Assault, Compl., ¶¶ 53, 56, (7) defendant Chase engaged in acts of intimidation against plaintiff following the Seventh Assault, Compl., ¶¶ 62-69, (8) defendants Robare, Osborn, Plonka, Gravlin, and Gettman "conspired to conceal" the Ninth Assault "by falsely reporting the incident[,]" Compl., ¶ 81, and (9) defendants Upstate Correctional Facility Superintendent Uhler, Deputy Superintendent of Security Bishop, DOCCS Special Investigators Nichols and Holmes, and DOCCS Commissioner Annucci failed to protect plaintiff from assaults that occurred after July 1, 2021, by denying his grievances and failing to take "remedial action" against the involved officials.  Compl., ¶¶ 23-26, 34-35, 38-39, 44-46, 51-52, 70-71, 74-75.

### 2.  Assaults By Other Inmates

#### a.  First Inmate Assault

On April 22, 2022, plaintiff returned to his cell from a program to find "several officers

standing outside" and "Inmate J . . . locked in the recreation cell."  Compl., ¶ 96.  "Inmate J immediately told plaintiff to tell the officers that plaintiff cannot stay in the cell, and threatened to beat-up plaintiff while calling [him] a 'rapo.'"  *Id.*, ¶ 97.  Defendant Corrections Sergeant McQuinn and defendant Corrections Officer Waite "disregarded Inmate J's repeated threats against plaintiff[,]" with McQuinn stating that "Bishop approved the double-bunk."  *Id.*, ¶ 98.  Defendants McQuinn and Waite then "exited the gallery before directing the recreation cell door to be open[ed] to allow Inmate J to enter the cell[.]"  *Id.*, ¶ 99.

Upon entering the cell, Inmate J "immediately attacked plaintiff" and did so for a second time "when the officer arrived to serve lunch."  Compl., ¶ 99.  Plaintiff submitted a grievance regarding the incident, which was "forwarded" to defendants Uhler and Bishop for resolution.  *Id.*, ¶ 100.  The grievance was denied and plaintiff was thereafter placed in another double-bunk cell and "assaulted by other prisoners."  *Id.*

### b.  Second Inmate Assault

On April 25, 2022, defendants Bishop and Corrections Sergeant Fletcher "recommended and directed" corrections officers to remove plaintiff from his cell "under the guise of a cell search" and place him in a cell with Inmate Tullis, "a known . . . gang member and undercover homosexual" with "a history of violence against other prisoners in double-bunk cells."  Compl., ¶ 102.  Each day between April 26 and April 29, 2022, Inmate Tullis threatened to assault plaintiff and forced him to engage in sexual activity.  *Id.*, ¶¶ 103-106.  On April 29, 2022, defendants Osborn and Corrections Lieutenant Rowe "stood before the door" while plaintiff was sexually assaulted, and thereafter, defendant Osborn told plaintiff that the behavior did not "look good."  *Id.*, ¶ 106.

13

On April 30 and May 1, 2022, Inmate Tullis again forced plaintiff to engage in sexual activity.  Compl., ¶¶ 107-108.  On May 2, 2022, plaintiff's grievance regarding the sexual assaults was "received by the Grievance Supervisors[,] who notified defendant [Corrections Captain] Veneske."  Compl., ¶ 108.  In response, defendant Veneske "directed" defendant Chase and Corrections Officer Welch (not a party) "to attack plaintiff at about 10:15 a.m."  *Id.*

At 5:00 p.m., Inmate Tullis again forced plaintiff to engage in sexual activity.  Compl., ¶ 109.  One hour later, plaintiff "called a Prison Rape Crisis Hotline and reported the sexual assault," and defendant Veneske thereafter removed plaintiff from the cell.  *Id.*, ¶¶ 110-111.  Although plaintiff submitted grievances regarding the sexual assaults, which were reviewed by defendants Bishop and Veneske and "forwarded to" defendants Nichols and Holmes for investigation, he "continued to be placed in a double-bunk cell and assaulted by other prisoners."  *Id.*, ¶¶ 111-112.

### c.  Third Inmate Assault

On May 2, 2022, plaintiff filed a grievance regarding a "retaliatory search" carried out by defendant Corrections Sergeant Keleher on May 1, 2023.  Compl., ¶ 113.  On May 5, 2022, defendant Keleher directed two searches of plaintiff's cell and then recommended, and received approval from defendants Bishop and Corrections Lieutenant Debyah, for Inmate Samuel to be double-bunked with plaintiff.  *Id.*, ¶ 114.  Defendants Keleher, Debyah, Gravlin, and Bishop "denied plaintiff's request for protective custody."  *Id.*, ¶ 115.  Yet these officials "were aware that Inmate Samuel had a history of violence against other prisoners [and] was a Blood gang member," and plaintiff "has a history of being victimized by Bloods and labeled a snitch."  *Id.*, ¶ 121.

14

Inmate Samuel was "forced by defendant Keleher into the cell and assaulted while handcuffed by defendant Osborn."  Compl., ¶ 117.  Inmate Samuel stated to these officials that he would not stay in the cell overnight and "immediately threatened to fight plaintiff[.]"  *Id.*  Shortly thereafter, Inmate Samuel "choked plaintiff from behind while sitting at the desk," causing plaintiff to "pass[ ] out[.]"  *Id.*, ¶ 118.  Inmate Samuel then "hog-tied plaintiff's hands behind his back and his legs, and dragged plaintiff to the recreation cell."  *Id.*

Defendants Keleher and Corrections Officer Harmer subsequently entered the cell and "maliciously" stepped on plaintiff's legs and feet while he was handcuffed, in order to untie him.  Compl., ¶ 119 (the "Tenth Assault").  Thereafter, defendants Keleher, Harmer, Osborn, and Gravlin "conspired to cover up the incident" by "falsely report[ing]" that "a cell fight" occurred, and omitting from the report any reference to defendants Keleher and Harmer entering the cell to untie plaintiff and stepping on him.  *Id.*, ¶ 120.  Plaintiff submitted a grievance regarding this incident, which was "forwarded to defendant Uhler for resolution."  *Id.*, ¶ 122.  Plaintiff also submitted a "complaint" to the Inspector General's Office detailing the incident, which was forwarded to defendants Nichols and Holmes "for investigation and remedial action."  *Id.*, ¶ 123.   Plaintiff's grievance was denied, and his complaint was dismissed, and he continued to be placed in a double-bunk cell where he was assaulted by other prisoners.  *Id.*, ¶¶ 122-123.

On May 13, 2022, "[a]s a means of retaliation for reporting sexual and physical assaults by other prisoners," defendant North "amended the Directive for double-cell housing assignments regarding victim prone inmates" to "permit inmates with a pattern of being victimized by other inmates to be double-bunk[ed] at the Deputy of Security's discretion."  *Id.*,

¶ 124.

### d. Fourth Inmate Assault

On June 8, 2022, defendants Gravlin and Rowe recommended plaintiff to be double-bunked with Inmate Johnson, which defendant Bishop approved.  Compl., ¶ 125.  Once they were in a cell together, Inmate Johnson threatened to attack plaintiff and harassed him about his criminal case and altercation with Inmate Samuel.  *Id.*, ¶ 126.  On July 17, 2022, Inmate Johnson was transferred out of Upstate Correctional Facility.  *Id.*, ¶ 127.  Apparently around this time, plaintiff filed a grievance requesting that he not be double-bunked, wherein he referenced the physical and sexual assaults he had experienced.  *Id.*

Thereafter, defendant Osborn and Rowe recommended that plaintiff be placed in a double-bunk cell with Inmate X, which defendant Bishop approved, even though Inmate X "appeared to need emergency mental health care and had a history of violence[.]"  Compl., ¶ 128.  The same day that Inmate X was placed in a cell with plaintiff, he was removed.  *Id.*

On August 1, 2022, plaintiff filed a grievance regarding officials placing rival gang members in double-bunk cells together, which "increases the violence among prisoners" at the facility.  Compl., ¶ 129.  On August 5, 2022, defendants Fletcher, Gravlin, and Bishop assigned plaintiff to be celled with Inmate Y, who "immediately" attacked plaintiff in the cell and was removed.  *Id.*, ¶¶ 130-131.  Defendants Fletcher, Gravlin, and Bishop "were aware that Inmate Y had a history of violence against prisoners, was a Blood who could not remain in a double cell with plaintiff because he has a sex offense, and plaintiff has a history of being victimized by Bloods whom [sic] labeled him a snitch."  *Id.*, ¶ 132.

16

Plaintiff submitted a grievance regarding this incident, which was "forwarded to defendant Uhler for resolution." *Id.*, ¶ 133.  Plaintiff also submitted a "complaint" to the Inspector General's Office detailing the incident, which was forwarded to defendants Nichols and Holmes "for investigation and remedial action." *Id.*, ¶ 134.   Plaintiff's grievance was denied, and his complaint was dismissed, and he continued to be placed in a double bunk cell where he was assaulted by other prisoners.  *Id.*, ¶¶ 133-134.

### e. Fifth Inmate Assault

On August 11, 2022, defendant Gravlin recommended that Inmate Jones be placed in a cell with plaintiff, which defendant Bishop approved even though Inmate Jones was a "known Blood" with a "history of violence against prisoners, and [weighed] about 220 pounds[.]"  Compl., ¶ 133.  Inmate Jones did not assault plaintiff, and was removed from the cell due to a pre-existing injury.  *Id.*, ¶ 134.  Defendants Gravlin and Bishop denied plaintiff's request for protective custody.  *Id.*, ¶ 135.

On August 15, 2022, defendants Fletcher and Gravlin recommended that Inmate Burrell be placed in a cell with plaintiff, which defendant Bishop approved even though Inmate Burrell was a "known Blood" and was "involved in a cell fight immediately before being placed in the cell with plaintiff."  Compl., ¶ 136.  Inmate Burrell informed plaintiff that Fletcher and Gravlin wanted plaintiff out of the cell, and thereafter "attacked" him twice, including once in the presence of defendant Harrigan.  *Id.*, ¶¶ 136-37.

Plaintiff submitted a grievance regarding this incident (and others), which was "forwarded to defendant Uhler for resolution."  *Id.*, ¶ 141.  Plaintiff also submitted a "complaint" to the Inspector General's Office detailing the incident, which was forwarded to

17

defendants Nichols and Holmes "for investigation and remedial action." *Id.*, ¶ 142.   Plaintiff's grievance was denied, and his complaint was dismissed, and he continued to be placed in a double bunk cell where he was assaulted by other prisoners. *Id.*, ¶¶ 141-142.

### f.  Sixth Inmate Assault

In November, 2022, defendants Uhler, Bishop, and "Classification and Movement" Officers John Doe #1 and John Doe #2 "conspired to transfer plaintiff back to Upstate [Correctional Facility] and . . . confine [him] in [a] double-cell[.]" Compl., ¶ 145.  On December 9, 2022, plaintiff was placed in a cell with Inmate Jones, who "punch[ed] plaintiff several times and choke[d] [him]." *Id.*, ¶ 146.  Defendant Corrections Officer Orbegozo and defendant Corrections Sergeant John Doe #1 arrived at the scene "while plaintiff was being attacked[,]" but elected to leave plaintiff in the cell. *Id.*, ¶ 147.

On the morning of December 10, 2022, Inmate Jones attacked plaintiff again.  Compl., ¶ 148.  Plaintiff was thereafter removed from the cell, having suffered injuries to his lower back and spine. *Id.*, ¶¶ 148-149.

### g.  Seventh Inmate Assault

On December 12, 2022, defendants Osborn, Plonka, Gettman, and Gravlin "directed plaintiff to exit his cell for a search" and then "moved [him] to a double cell as a means of retaliation and with the approval of defendant Bishop." Compl., ¶ 150.  Plaintiff was placed in a cell with Inmate Flenders, "who had a history of violence against other prisoners." *Id.*, ¶ 151.

Inmate Flenders "threatened to attack plaintiff[,]" which was reported to defendants Osborn and Plonka, who ignored the information.  Compl., ¶ 152.  Thereafter, Inmate

Flenders "punched plaintiff several times," which was again reported to defendants Osborn and Plonka. *Id.*, ¶ 153. After a second assault on plaintiff by this inmate, defendant Osborn arrived at the cell and "repeatedly" sprayed plaintiff with mace. *Id.*, ¶ 154. Defendants Gravlin, Osborn, Carter, and Plonka then removed plaintiff from the cell and relocated him to a double-bunk cell with Inmate Williams, with the approval of defendant Bishop, even though this inmate also "had a history of violence against prisoners" and was "a known Blood gang member[.]" *Id.*, ¶ 155. Inmate Williams "attacked plaintiff" three times, causing him "serious injuries[.]" *Id.*, ¶ 156.

Plaintiff submitted a grievance regarding this incident and the Sixth Inmate Assault, which was "forwarded to defendant Uhler for resolution." *Id.*, ¶ 158. Plaintiff also submitted a "complaint" to the Inspector General's Office detailing the incident, which was forwarded to defendants Nichols and Holmes "for investigation and remedial action." *Id.*, ¶ 159. Plaintiff's grievance was denied, and his complaint was dismissed, and he continued to be placed in a double bunk cell where he was assaulted by other prisoners. *Id.*, ¶¶ 158-159.

Defendants Nurse Sturgen and Nurse Lewis also "disregarded plaintiff's medical conditions" and failed to exempt him from further placement in a double-bunk cell. Compl., ¶ 160.

### h. Eighth Inmate Assault

On January 23, 2023, plaintiff was housed in a cell with Inmate Z, who informed the gallery officer (not a party) that he did not want to remain in the cell with plaintiff and intended to "fight" him. Compl., ¶ 162. The officer advised plaintiff that defendant Corrections Sergeant Sharpe would address the situation in the morning and had him remain in the cell.

*Id.* At some point, plaintiff submitted letters to defendant Dumas, which indicated that he had been assaulted with a "makeshift weapon" by Inmate Z, who threatened to attack plaintiff again. *Id.*, ¶ 163. Defendant Dumas "disregarded the letters" and "continued [to] pass plaintiff" at his cell. *Id.* Plaintiff also informed defendant Sturgen about the threat during a cell visit, and this official stated that he did not stop by for that issue, and walked away. *Id.*

Plaintiff submitted a grievance regarding this incident, which was "forwarded to defendant Uhler for resolution." *Id.*, ¶ 167. Plaintiff also submitted a "complaint" to the Inspector General's Office detailing the incident, which was forwarded to defendants Nichols and Holmes "for investigation and remedial action." *Id.*, ¶ 168. Plaintiff's grievance was denied, and his complaint was dismissed, and he continued to be placed in a double bunk cell where he was assaulted by other prisoners. *Id.*, ¶¶ 167-168.

Defendant Lewis also "disregarded plaintiff's medical condition[,] which should have precluded [him] from double-bunking[.]" Compl., ¶ 169.

### i. Ninth Inmate Assault

On March 6, 2023, defendants Gravlin, Corrections Officer Hollenbeck, and Corrections Sergeant DeCosse recommended plaintiff's placement in a double-bunk cell with Inmate Davis, which defendant Bishop approved even though Inmate Davis was "over 300 pound[s]" and "a known Blood with a[n] extensive history of violence against other prisoners[.]" Compl., ¶ 171. The next day, plaintiff informed a counselor about his cell placement and fear for his safety. *Id.*, ¶ 172. Five days later, Inmate Davis reached an agreement with defendant Hollenbeck to move him to a larger cell. *Id.*, ¶ 173. Roughly one hour after this agreement was reached, Inmate Davis "angerly [sic] asked [defendant

Corrections] Officer Connor Gordon where is Hollenbeck and preceded [sic] to attack plaintiff by grabbing [him] by the sweater and swing[ing] and slamming [him] [in]to the door and ground[,] then cutting [him] twice on the left side of his face." *Id.*, ¶ 174.  As a result of defendant Bishop's failure to "do a reassessment" following this incident, plaintiff was relocated to a cell with another gang member who was involved in a cell fight minutes before plaintiff arrived.  *Id.*, ¶ 175.

Plaintiff submitted a grievance regarding this incident, which was "forwarded to defendant Uhler for resolution." *Id.*, ¶ 178.  Plaintiff also submitted a "complaint" to the Inspector General's Office detailing the incident, which was forwarded to defendants Nichols and Holmes "for investigation and remedial action." *Id.*, ¶ 180.  Plaintiff's grievance was denied, and his complaint was dismissed, and he continues to be at risk of placement in a double bunk cell where he was assaulted by other prisoners. *Id.*, ¶¶ 178, 180.

Following this incident, defendants DeCosse and Bishop denied plaintiff's request for protective custody.  Compl., ¶ 179.

Defendant Lewis also "disregarded plaintiff's medical condition[,] which should have precluded [him] from double-bunking[.]"  Compl., ¶ 182.

On April 14, 2023, defendants Gravlin, Bishop, and Corrections Sergeant Jubert "had plaintiff assigned to a cell with [a] prisoner [that] medical did not clear for 'TB' test[,]" and defendant Jubert informed plaintiff that he would be placed in a double-bunk cell "as soon as possible."  Compl., ¶ 179.

Defendant DOCCS Commissioner Annucci "enacted or approved the double-celling policy that plaintiff has been subjected to" during his incarceration.  Compl., ¶ 185.

21

### 3. Discipline

The complaint identifies the following incidents where plaintiff was issued a misbehavior report that was allegedly based on false charges and/or resulted in a disciplinary sanction of restrictive confinement.

### a. First Disciplinary Sentence

On or about November 1, 2021, plaintiff was issued two misbehavior reports charging him with, among other things, two sex offenses based on allegations that he made sexually charged statements to two corrections officials in response to their orders.  Compl., ¶¶ 187-189.  On November 9, 2021, defendant Commissioner Hearing Officer S. Martin presided over plaintiff's combined disciplinary hearing ("the First Disciplinary Hearing") and found him guilty of all charges except interference in the first report and violent conduct in the second report.  *Id.*, ¶ 190.  As a result of improperly finding plaintiff guilty of two sex offenses even though plaintiff's conduct did not constitute a sex offense, defendant Martin sentenced plaintiff to 90 days confinement in the special housing unit ("SHU").  *Id.*  Plaintiff appealed defendant Martin's disciplinary determination, which was affirmed by defendants Uhler and DOCCS Director of Special Housing Unit Rodriguez.  *Id.*, ¶¶ 191-193.  At the time the sanction was imposed, plaintiff was already serving a 360-day SHU sanction.  *Id.*, ¶ 195.  Plaintiff served the 90-day SHU sanction between December 3, 2022 and March 3, 2023.  *Id.*, ¶ 198.

### b. Second Disciplinary Sentence

On November 16, 2021, plaintiff "reported to medical staff and [a] sergeant that defendant Menard slammed his hand and kept it wedged in the hatch on the cell door."

22

Compl., ¶ 199.  Two days later, plaintiff was issued a misbehavior report that charged him with various rules violations based on his alleged refusal of a direct order to return a tray to defendant Menard on November 16, 2021.  *Id.*, ¶ 200.

On December 1, 2021, defendant Institutional Steward Terriah presided over plaintiff's disciplinary hearing ("the Second Disciplinary Hearing"), found plaintiff guilty of all charges in the misbehavior report, and imposed a penalty of 15 days of SHU confinement.  Compl., ¶ 202.  Plaintiff appealed the disciplinary determination on the grounds that "SHU could not be imposed for the allege[d] offenses" in the misbehavior report.  *Id.*, ¶ 203.  Defendant Rodriguez failed to decide plaintiff's appeal within the 60-day deadline, which is "considered a constructive denial."  *Id.*, ¶ 204.  Plaintiff served the 15-day SHU sanction between March 3 and March 18, 2023.  *Id.*, ¶ 209.  Defendant Rodriguez then "extended" plaintiff's SHU sanction by another 30 days to April 12, 2023.  *Id.*

### c.  Third Disciplinary Sentence

On November 21, 2021, plaintiff submitted a grievance regarding defendant Menard issuing him a false misbehavior report on November 18, 2021.  Compl., ¶ 211.  On December 5, 2021, defendant Menard issued plaintiff a false misbehavior report charging him with various rules violations related to refusing direct orders and creating a disturbance in his cell.  *Id.*, ¶¶ 212-213.

On December 23, 2022, defendant Terriah presided over plaintiff's disciplinary hearing ("the Third Disciplinary Hearing"), found plaintiff guilty of all charges in the misbehavior report, and imposed a penalty of 30 days of SHU confinement.  Compl., ¶ 214.  Plaintiff appealed the disciplinary determination on the grounds that the misbehavior report was

"false and retaliatory" and "SHU confinement could not be imposed for the alleged offenses" in the misbehavior report. *Id.*, ¶ 215. On February 8, 2022, defendant Rodriguez modified the hearing decision by dismissing the interference charge, but failed to dismiss the improper SHU sanction. *Id.*, ¶ 216. Plaintiff is "expected to serve the 30 day SHU sanction from March 18, 2023 to April 17, 2023." *Id.*, ¶ 221.

### d. Fourth Disciplinary Sentence

On January 13, 2022, plaintiff filed a grievance regarding a "retaliatory cell search" and threat made to him by defendant Marshall in the presence of defendant Gettman. Compl., ¶ 223. On January 30, 2022, defendant Marshall issued plaintiff a misbehavior report, which charged him with assault on staff and other rules violations in connection with a use-of-force incident. *Id.*, ¶ 224.

At the conclusion of plaintiff's disciplinary hearing on February 17, 2022 ("the Fourth Disciplinary Hearing"), defendant Bishop found plaintiff guilty of the charges in the misbehavior report and imposed a penalty of 240 days of SHU confinement, and loss of package and commissary privileges. Compl., ¶ 226. On February 24, 2022, defendant Uhler reviewed and affirmed the disciplinary determination. *Id.*, ¶ 278. On April 21, 2022, defendant Rodriguez modified the SHU sanction to 180 days and otherwise affirmed the hearing decision. *Id.*, ¶ 229. Plaintiff is expected to either start or finish serving the 180-day SHU sanction on October 14, 2023. *Id.*, ¶ 233.

### e. Fifth Disciplinary Sentence

In "early April 2022," plaintiff filed a grievance and motion for injunctive relief in an ongoing federal lawsuit about his placement in a double-bunk cell. Compl., ¶ 235. On April

24

22, 2022, plaintiff was issued two misbehavior reports in connection with his altercation with Inmate J. *Id.*, ¶¶ 236-238.

At the conclusion of plaintiff's disciplinary hearing on April 26, 2022 ("the Fifth Disciplinary Hearing"), defendant Bishop found plaintiff guilty of the charges in the two misbehavior reports and imposed a penalty of 90 days of SHU confinement and loss of package and commissary privileges. Compl., ¶ 240. On April 29, 2022, defendant Uhler reviewed and affirmed the disciplinary determination even though SHU could not be imposed for the charged offenses pursuant to New York Correction Law § 137. *Id.*, ¶¶ 241-242. On July 12, 2022, defendant Rodriguez reviewed and affirmed the disciplinary determination. *Id.*, ¶ 243. Plaintiff is expected to serve the disciplinary sentence sometime between October, 2023 and January, 2024. *Id.*, ¶ 248.

### f. Sixth Disciplinary Sentence

On December 10, 2022, plaintiff was issued a misbehavior report for fighting with his cellmate. Compl., ¶ 249. At the conclusion of plaintiff's disciplinary hearing on December 23, 2022 ("the Sixth Disciplinary Hearing"), defendant Commissioner Hearing Officer LaPlant found plaintiff guilty of the charges in the misbehavior report and imposed a penalty of 30 days of SHU confinement and one month loss of good time credits. *Id.*, ¶ 251. On January 9, 2023, plaintiff appealed the disciplinary determination on the grounds that SHU could not be imposed for the charged violations, and the imposed penalties were retaliatory. *Id.*, ¶ 252. Defendant Rodriguez failed to decide plaintiff's appeal within 60 days in accordance with DOCCS' regulations "as a means to keep plaintiff confined in segregation." *Id.*, ¶ 253. Plaintiff is expected to serve this SHU sanction sometime between February and June, 2024.

*Id.*, ¶¶ 259-260.

Each of the imposed SHU sanctions were authorized and/or ignored by defendant Annucci.  Compl., ¶ 260.

### 4. Confinement Conditions

In addition to the assaults discussed above, the complaint identifies the following "atypical" conditions of confinement experienced by plaintiff between May, 2021 and April 11, 2022: (1) a deprivation of nine out of twelve meals between May 28 and May 31, 2021, Compl., ¶ 262; (2) a deprivation of ten out of twelve meals between July 1 and July 4, 2021, and numerous additional meal deprivations between July 6, 2021 and April, 2022, Compl., ¶ 264; (3) inadequate heating due to the heat vent being turned off and cold air being blown in to plaintiff's housing unit, at the direction of defendant Gravlin, between September 25 and October 2, 2021, Compl., ¶ 267; (4) defendant Corrections Officer Austin Martin removing plaintiff's mattress from his cell, with approval from defendant Marshall, from December 6 to December 11, 2021, Compl., ¶ 269; (5) defendant Corrections Sergeant Jane Doe "compell[ing] plaintiff to remain outside to stand in the freezing cold weather for about five or six hours while the officers and defendant Jane Doe remained inside the facility or on the bus with other prisoners[,]" Compl., ¶ 268; (6) the deprivation of a change of underwear and clothing between December 20, 2021 and January 23, 2022, Compl., ¶ 270; (7) defendant Sturgen forcing plaintiff to quarantine in his cell for fourteen days in July, 2021 and October, 2021 based on his refusal to "take a COVID-19 test[,]" Compl., ¶ 271; (8) searching plaintiff's cell and at times placing him in unclean cells without cleaning supplies at various points between May 25, 2021 and April 11, 2022, in response to him filing grievances, Compl., ¶¶ 272-290; (9) defendants Corrections Officers John Doe #5, Lamica, Locke, Keating, John

26

Doe #6, and Ayer denying plaintiff access to legal mail on multiple dates between August and December, 2021, Compl., ¶¶ 291-295; (10) defendants Veneske and Gravlin denying plaintiff weekly phone calls on four separate occasions between July and December, 2021, Compl., ¶ 297; and (11) plaintiff's continuous confinement in the SHU between January 10, 2018 and April 12, 2022, Compl., ¶ 298.

Between April 12, 2022 and April 12, 2023, plaintiff was continuously confined in the RRU, where his confinement conditions were "identical to his confinement in the SHU, with the exception of approximately two hours of programming." Compl., ¶ 303. In addition to the assaults discussed above, the complaint identifies the following "atypical" conditions of confinement experienced by plaintiff during this time: (1) denial of "congregate religious services [and] recreation[,]" Compl., ¶ 303; (2) defendants Dumas, Gravell, and Mental Health Professionals Jane Doe #1 and Jane Doe #2 refusing to speak with plaintiff during rounds or place his name on callouts for private interviews between October 1, 2022 and April 12, 2023, Compl., ¶ 308; (3) defendant Jane Doe #2 disregarding plaintiff's request for an intake interview and stated concerns regarding depression and anxiety on April 3, 2023, Compl., ¶ 310; (4) defendant Jane Doe #1 failing to schedule plaintiff for a private mental health interview and, along with defendant Dumas, ignoring plaintiff's complaints regarding a lack of mental health care on April 12, 2023, Compl., ¶ 312; (5) defendants Gravlin, Veneske, Uhler, and Bishop denying plaintiff in-cell cleaning supplies between April and September, 2022, and December, 2022 and January, 2023, Compl., ¶¶ 315-318; (6) defendants Fletcher and Keleher directing retaliatory searches of plaintiff's cell between April 25 and May 5, 2022, which defendants Uhler and Bishop failed to remedy, Compl., ¶¶ 319-326; (7) defendant Deputy Superintendent of Programs Stickney depriving plaintiff of a personalized

27

rehabilitation plan and limiting his out-of-cell programming to two hours per day, Compl., ¶¶ 332-340; (8) defendants Stickney and Bishop denying plaintiff weekly congregate services each week between April 12, 2022 and April 12, 2023, Compl., ¶¶ 341-342; (9) defendant Annucci denying plaintiff a nutritionally adequate diet "as a cost saving measure" since 2019, Compl., ¶¶ 343-347; (10) denial of tablet services, packages, congregate recreation, access to the law library, daily showers, full access to commissary services, and the opportunity to appear at grievance hearings throughout plaintiff's placement in the RRU, Compl., ¶¶ 348-356; (11) defendant Bishop forcing plaintiff to share a cell with another inmate in excess of sixty days, Compl., ¶¶ 357-359; (12) defendants Uhler and Bishop requiring plaintiff to wear handcuffs and shackles for all out-of-cell movement, and to remain shackled during programs, Compl., ¶¶ 361-367; and (13) defendants Uhler and Bishop denying plaintiff access to certain personal property throughout his placement in the RRU, Compl., ¶¶ 371-372.

### 5. Plaintiff's Claims

Liberally construed, the complaint asserts the following claims for relief against the named defendants in their individual capacities: (1) First Amendment retaliation claims against defendants Osborn, Bailey, Menard, Trombley, Marshall, Keleher, North, Plonka, Gettman, Gravlin, Bishop, Mitchell, Fletcher, Veneske, Uhler, Rowe, Classification and Movement Corrections Officers John Doe #1 and John Doe #2, Sturgen, Austin Martin, Lamica, Locke, and Keating; (2) First Amendment mail tampering claims against defendants Corrections Officer John Doe #5, Lamica, Locke, Keating, Lord, John Doe #6, and Ayer; (3) First Amendment free exercise claims against defendants Bishop, Stickney, Uhler, and Annucci; (4) Eighth Amendment excessive force and failure-to-intervene claims against

28

defendants Osborn, Corrections Sergeant John Doe #1, Phillips, Tyler, Menard, Bailey, Trombley, Cymbrak, Mitchell, Chase, Marshall, Gettman, Morrison, Corrections Sergeant John Doe #2, Corrections Officer John Doe #3, Gravlin, Robare, Carter, Corrections Officer John Doe #4, Plonka, Keleher, and Harmer; (5) Eighth Amendment failure-to-protect claims against defendants McQuinn, Waite, Bishop, Uhler, Fletcher, Osborn, Rowe, Veneske, Nichols, Holmes, Annucci, Keleher, Debyah, Gravlin, North, Harrigan, Classification and Movement Corrections Officers John Doe #1 and John Doe #2, Orbegozo, Corrections Sergeant John Doe #1, Plonka, Gettman, Carter, Sturgen, Lewis, Sharpe, Dumas, Hollenbeck, DeCosse, Gordon, and Jubert; (6) Eighth Amendment conditions-of-confinement claims against defendants Gravlin, Uhler, Bishop, Sergeant Jane Doe, Austin Martin, Marshall, Sturgen, and Veneske based on COVID-19 quarantine requirements, unhygienic conditions, inadequate heating and clothing, and inadequate sleeping accommodations; (7) an Eighth Amendment conditions-of-confinement claim against defendant Annucci based on plaintiff's receipt of an inadequate diet; (8) Eighth Amendment conditions-of-confinement claims against defendants Uhler, Bishop, and Annucci based on excessive restrictive confinement in the SHU from August 1, 2021 to April 12, 2022; (9) Eighth Amendment conditions-of-confinement claims against defendants S. Martin, Uhler, Rodriguez, Terriah, Bishop, LaPlant, Stickney, and Annucci based on excessive restrictive confinement in the RRU; (10) Eighth Amendment medical indifference claims against defendants Dumas, Gravell, Jane Doe #1 and Jane Doe #2 based on denying plaintiff access to adequate medical and mental health treatment; (11) Fourteenth Amendment disciplinary due process claims against defendants S. Martin, Uhler, Rodriguez, Terriah, Bishop, and LaPlant; (12) Fourteenth Amendment due process claims against defendants Gravlin and Veneske based

on denying plaintiff access to phone calls; (13) Fourteenth Amendment due process claims against defendants Stickney, Bishop, Uhler, Gravlin, Veneske, and Annucci based on the nature of plaintiff's confinement in the RRU; and (14) conspiracy claims against defendants Tyler, Phillips, Hooper, McGee, Robare, Gravlin, Keleher, Harmer, and Osborn.

Plaintiff seeks an award of money damages and injunctive relief. Compl. at 45. For a complete statement of plaintiff's claims and the facts he relies on in support of those claims, reference is made to the complaint.

### C.    Analysis

Plaintiff seeks relief pursuant to Section 1983, which establishes a cause of action for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990)); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (finding that "[Section] 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

### 1.   Hastings, Peterson, and Spinner

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263,

2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

The Second Circuit recently clarified that "there is no special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  Instead, "'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 676).

"Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi*, No. 9:06-CV-889 (GTS/DRH), 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) (citing *Gonzalez v. City of New York*, No. 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998)).

Here, plaintiff names Corrections Officers Hastings and Peterson and Steward Spinner as defendants without any allegations of wrongdoing by these individuals in the body of the complaint.  Indeed, it is entirely unclear how and when, if at all, these officials may have violated plaintiff's federal rights.  *See generally*, Compl.

Accordingly, plaintiff's Section 1983 claims against defendants Hastings, Peterson, and Spinner are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 2.  Retaliation Claims

Courts must approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)

(*quoting Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).  To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (*quoting Dawes*, 239 F.3d at 492).  "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

Here, the Court liberally construes the complaint to assert retaliation claims against the following officials: (1) defendant Osborn based on this official initiating or participating in the First Assault, Fourth Assault, Eighth Assault, and Ninth Assault, and failing to protect plaintiff with respect to the second inmate assault, third inmate assault and seventh inmate assault, in response to plaintiff filing grievances against him, Compl., ¶¶ 16, 31, 71-73, 76-84, 101-106, 120, 150-155 ("First Retaliation Claim"); (2) defendants Lamica, Locke, and Keating denying plaintiff access to legal mail between August ad October, 2021, in response to plaintiff filing grievances against them, Compl., ¶¶ 292-294 ("Second Retaliation Claim"); (3) defendant Sturgen forcing plaintiff to quarantine in his cell for fourteen days in July, 2021 and October, 2021 based on his refusal to "take a COVID-19 test[,]" Compl., ¶ 271 ("Third Retaliation Claim"); (4) defendant Menard initiating the Fifth Assault in response to plaintiff filing a grievance against him, Compl., ¶ 37 ("Fourth Retaliation Claim"); (5) defendant Trombley participating in the Sixth Assault in response to plaintiff filing a lawsuit against him, Compl., ¶ 43 ("Fifth Retaliation Claim"); (6) defendants Bailey and Trombley engaging in

32

retaliatory acts of intimidation against plaintiff following the Sixth Assault in response to plaintiff filing grievances against them, Compl., ¶¶ 40-52 ("Sixth Retaliation Claim"); (7) defendant Austin Martin removing plaintiff's mattress from his cell, with approval from defendant Marshall, from December 6 to December 11, 2021, in response to plaintiff filing a grievance against him, Compl., ¶¶ 190-193, 269 ("Seventh Retaliation Claim"); (8) defendant Marshall directing "retaliatory search[es]" of plaintiff's cell on January 6 and January 30, 2022, prior to the Seventh Assault, and participating in the Seventh Assault, in response to plaintiff filing grievances and a lawsuit against him, Compl., ¶¶ 27-29, 53-60, 222-224 ("Eighth Retaliation Claim"); (9) defendant Mitchell participating in the Seventh Assault in response to plaintiff filing a grievance against him for his role in a use-of-force incident on July 12, 2021, and/or for filing a grievance against him shortly before the Seventh Assault, Compl., ¶¶ 27-29, 222 ("Ninth Retaliation Claim"); (10) defendant Veneske directing defendants Welch and Chase to attack plaintiff on May 2, 2022, in response to plaintiff filing a grievance regarding sexual assaults committed against him earlier that day, Compl., ¶ 108 ("Tenth Retaliation Claim"); (11) defendant Keleher directing two searches of plaintiff's cell and recommending him for placement in a cell with Inmate Samuel on May 5, 2022, in response to plaintiff filing a grievance against this official days earlier, Compl., ¶¶ 113-114 ("Eleventh Retaliation Claim"); (12) defendant North "amend[ing] the Directive for double-cell housing assignments regarding victim prone inmates" on May 13, 2022, to "permit inmates with a pattern of being victimized by other inmates to be double-bunk[ed] at the Deputy of Security's discretion[,]" in response to plaintiff "reporting sexual and physical assaults by other prisoners," Compl., ¶ 124 ("Twelfth Retaliation Claim"); (13) defendants Rowe and Osborn recommending, and defendant Bishop approving, plaintiff to be celled with Inmate X,

in response to plaintiff filing a grievance regarding "double-bunking[,]" Compl., ¶¶ 128

("Thirteenth Retaliation Claim"); (14) defendants Fletcher, Gravlin, and Bishop assigning

plaintiff to be celled with Inmate Y on August 5, 2022, in response to plaintiff filing a

grievance a few days earlier regarding officials placing rival gang members in double-bunk

cells together, Compl., ¶¶ 129-131 ("Fourteenth Retaliation Claim"); (15) defendants Uhler,

Bishop, and Classification and Movement Officials John Doe #1 and John Doe #2

"conspir[ing] to transfer plaintiff back to Upstate [Correctional Facility] and . . . confine [him] in

[a] double-cell" in late 2022, in response to grievances and lawsuits filed regarding his

placement in a double-bunk cell, Compl., ¶¶ 145-184 ("Fifteenth Retaliation Claim"); (16)

defendants Osborn, Plonka, Gettman, and Gravlin "mov[ing] plaintiff to a double cell" with

Inmate Flenders on December 12, 2022, and then relocating him to a cell with Inmate

Williams based on his complaints about being housed with Inmate Flenders and earlier

grievances that he filed, Compl., ¶¶ 150-156 ("Sixteenth Retaliation Claim"); and (17)

defendants Fletcher and Keleher directing searches of plaintiff's cell between April 25 and

May 5, 2022, which defendants Uhler and Bishop failed to remedy, in response to earlier

grievances and/or lawsuits that plaintiff filed against these officials, Compl., ¶¶ 319-326

("Seventeenth Retaliation Claim").

With respect to the Second Retaliation Claim against defendant Locke, the complaint

lacks allegations which plausibly suggest that the single alleged incident of mail tampering

resulted in any sort of material injury to plaintiff, or otherwise deterred him from pursuing his

legal action.  Thus, plaintiff has failed to adequately allege that defendant Locke's conduct

rises to the level of adverse action that would deter a similarly situated individual of ordinary

firmness from exercising his or her constitutional rights. *Rasheen v. Adner*, 356 F. Supp. 3d

222, 243-44 (N.D.N.Y. 2019) (finding an isolated incident of mail tampering did not constitute an adverse action because plaintiff failed to allege facts plausibly suggesting that he suffered any injury as a result); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (collecting cases in which claims of mail tampering did not constitute an adverse action, noting in particular that the plaintiff had alleged only a single instance of mail interference); *Islam v. Goord*, No. 05-CV-7502, 2006 WL 2819651, at *7 (S.D.N.Y. Sept. 29, 2006) (finding that isolated incidents of tampering with plaintiff's family and legal mail was not an adverse action because it would not deter an ordinary individual from exercising his constitutional rights and plaintiff failed to allege he suffered any injury as a result of the tampering). Accordingly, plaintiff's Second Retaliation Claim against defendant Locke is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

With respect to the Third Retaliation Claim against defendant Sturgen, even assuming that plaintiff's election not to "take a COVID-19 test" satisfies the protected activity requirement, the complaint lacks allegations which plausibly suggest that placing plaintiff on quarantine status constitutes adverse action that was substantially motivated by a desire to punish plaintiff for engaging in protected activity, as opposed to a desire to impose facility-wide health precautions. Accordingly, plaintiff's Third Retaliation Claim against defendant Sturgen is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

With respect to the Seventh Retaliation Claim against defendant Austin Martin, although the complaint conclusorily alleges that this official removed plaintiff's mattress from

his cell on December 6, 2021, "as a means of retaliation for filing a grievance against him[,]" the complaint does not identify any wrongdoing by this official prior to December 6, 2021, let alone indicate when plaintiff filed a grievance against this official.  Thus, the Court has no basis to plausibly infer that the alleged wrongdoing on December 6, 2021, was substantially motivated by plaintiff's engagement in protected activity.  Accordingly, plaintiff's Seventh Retaliation Claim against defendant Martin is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

With respect to the Twelfth Retaliation Claim against defendant North, the complaint lacks allegations which plausibly suggest that (1) defendant North was employed at Upstate C.F.; or (2) the alleged Directive amendment impacted only inmates at this facility.  In addition, the Court has no basis to plausibly infer from the allegations in the complaint that defendant North was aware of plaintiff's engagement in protected activity before allegedly amending the Directive regarding double-celling.  Thus, the complaint fails to adequately allege that defendant North's conduct was substantially motivated by plaintiff's engagement in protected activity.  *See, e.g.*, *Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2017 WL 384066, at *7 (N.D.N.Y. Jan. 27, 2017) (dismissing retaliation claim against corrections officer where plaintiff failed to allege that corrections officer was aware of the protected activity that gave rise to the claim); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 208 (N.D.N.Y. 2015) (same); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 368 (N.D.N.Y. 2010) ("Plaintiff has failed to demonstrate a causal connection between his conduct and the adverse action of leaving the lights on in the SHU twenty-four hours a day since this policy applied to all inmates in the SHU, not just Plaintiff. . . . Therefore, Plaintiff cannot sustain a

claim a retaliation since the adverse action was not directed at him, but rather the entire SHU population.").  Accordingly, plaintiff's Twelfth Retaliation Claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

With respect to the Fifteenth Retaliation Claim against defendants Uhler, Bishop, and Classification and Movement Officials John Doe #1 and John Doe #2 based on these officials allegedly "conspir[ing] to transfer plaintiff back to Upstate [Correctional Facility] and . . . confine [him] in [a] double-cell" in late 2022, in response to grievances and lawsuits filed by plaintiff regarding his placement in a double-bunk cell, the complaint is devoid of allegations explaining how defendants John Doe #1 and John Doe #2 – both of whom are allegedly employed at the DOCCS Central Office in Albany, New York – may have known about lawsuits or grievances plaintiff filed related to double-celling.  Furthermore, the complaint does not include any allegations explaining the basis for plaintiff's knowledge that these officials "conspired" with defendants Uhler and Bishop to return plaintiff back to Upstate C.F.  Indeed, beyond plaintiff's speculation, the Court has no basis to plausibly infer that, but for plaintiff filing grievances and commencing litigation regarding double-celling, he would not have been transferred back to Upstate C.F. in or around November, 2022.  Accordingly, plaintiff's Fifteenth Retaliation Claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

With respect to the remaining retaliation claims identified above, the Court finds that the complaint alleges enough to warrant a response.  Accordingly, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, *see Sealed*

37

*Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that all retaliation claims other than the Second Retaliation Claim against defendant Locke, the Third Retaliation Claim, the Seventh Retaliation claim, the Twelfth Retaliation Claim, and the Fifteenth Retaliation Claim survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 3.  Mail Tampering Claims

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis*, 320 F.3d at 351.  A prisoner's mail may only be restricted to further "'one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Id*. (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).  "The First Amendment protects prisoners' access to mail directly, unlike the right of access to courts, which protects prisoners' access to mail only derivatively and with respect to given claims." *Bellezza v. Holland*, No. 09-CV-8434, 2011 WL 2848141, at *6 (S.D.N.Y. July 12, 2011) (dismissing access-to-the-courts claim for failure to allege injury, but holding that plaintiff adequately alleged a violation of his right to send and receive mail).  "It is thus not necessary to allege actual injury when asserting a violation of one's right to the free flow of mail." *Antrobus v. City of New York*, No. 11-CV-2524, 2014 WL 1285648, at *4 (S.D.N.Y. Mar. 27, 2014) (citations omitted).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to

legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351.  "While a prisoner has a right to be present when his legal mail is opened, . . . an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

In this case, the complaint alleges that plaintiff was denied access to legal mail on the following dates by the following officials: (1) on August 6, 2021, by defendant John Doe #5; (2) on September 15, 16, 17 and October 6, 7, 8, 9, 15, 16, 17, 18, and 19, 2021, by defendant Lamica; (3) on September 22, 2021, by defendant Lord; (4) on October 7, 2021, by defendant Locke; (5) on October 8, 2021, by defendant John Doe #6; (6) on October 22 and 23, 2021, by defendant Keating; and (7) on November 5 and December 1, 2021, by defendant Ayer.  Compl., ¶¶ 291-295.

At this stage of the proceeding, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's mail tampering claims against defendants Lamica, Lord, Locke, John Doe #6, Keating, and Ayer survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

The Court, however, reaches a different conclusion with respect to plaintiff's mail

tampering claim against defendant John Doe #5 because (1) this official's alleged refusal to provide plaintiff with access to legal mail was the first time plaintiff experienced this type of deprivation, and (2) a single incident of mail tampering – the first of its kind – does not plausibly suggest an ongoing practice of censorship unjustified by a substantial government interest.

Accordingly, plaintiff's mail tampering claim against defendant John Doe #5 is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 4. Free Exercise Claims

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See* U.S. Const. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

To state a claim under the Free Exercise Clause of the First Amendment, an inmate "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (articulating test that inmates "must show at the threshold that the disputed conduct . . . burdens his sincerely held religious beliefs," prior to advancing to the *Turner* test and "legitimate penological interests that justify the impinging conduct"). "For a burden to be substantial, a plaintiff must demonstrate that

40

the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith." *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at *22 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 590 Fed. App'x 82 (2d Cir. 2015) (summary order).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's Free Exercise claims survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 5. Excessive Force and Failure-to-Intervene Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  This includes punishments that "involve the unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency."  *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).[6]

---

[6]  In this regard, while "a *de minimis* use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated."  *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9).  The key inquiry into a claim of

(continued...)

"To determine whether a defendant acted maliciously, several factors should be examined including, 'the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.'" *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (quoting *Romano*, 998 F.2d at 105).

When a citizen is subjected to excessive force, "an officer who fails to intervene where he or she observes or has reason to know that excessive force is being used or a constitutional violation has been committed by a fellow officer is liable for the preventable harm caused by that officer." *Portillo v. Webb*, No. 16-CV-4731, 2017 WL 4570374, at *4 (S.D.N.Y. Oct. 11, 2017) (collecting cases), *report and recommendation adopted by* 2018 WL 481889 (S.D.N.Y. Jan. 17, 2018); *see also Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (internal quotation marks and citation omitted)).

At this stage of the proceeding, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, the Court finds that each of plaintiff's Eighth Amendment excessive force and failure-to-intervene claims survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

---

[6](...continued)
excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see also Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

42

### 6. Failure-to-Protect Claims

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs*., 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  Prison officials may be held liable under Section 1983 for failing to protect an inmate from conditions posing a substantial risk of serious harm.  *See Farmer*, 511 U.S. at 836.  In order to establish a "failure to protect," the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety.  *Id*.  Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Id*. at 837.

"One way to make out such a claim is to allege that 'a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk and thus must have known about it.'"  *Coronado v. Goord*, No. 99-CV-1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (quoting *Farmer*, 511 U.S. at 842-43); *see also Hayes*, 84 F.3d at 620-21 (prisoner's repeated expressions of fear following an inmate attack and requests for transfer as a safety measure raised a question of fact).  "Courts have [also] found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted."  *Davis v. Torres*, No. 10-CV-

2236, 2012 WL 3070092, at *5 (S.D.N.Y. May 2, 2012), *report and recommendation adopted by* 2012 WL 3070083 (S.D.N.Y. July 27, 2012); *see also Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment where plaintiff presented evidence that he informed sergeant of correction officers' threatening behavior and was later assaulted by those officers).

"On the other hand, an inmate's communications about 'generalized safety concerns' or 'vague concerns of future assault by unknown individuals' are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." *Stephens v. Venettozzi*, No. 13-CV-5779, 2016 WL 929268, at *19 (S.D.N.Y. Feb. 24, 2016) (quoting *Ross v. City of New York*, No. 12-CV-8545, 2014 WL 3844783, at *8 (S.D.N.Y. 2014), *rev'd on other grounds*, No. 14-3327 (2d Cir. July 20, 2015) (summary order)), *report and recommendation adopted sub nom. Stephens v. Venetozzi*, 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016). "Neither mere negligence nor a prison guard's mere failure to act reasonably is enough to state an Eighth Amendment deliberate indifference claim." *Sawyer v. New York State Depat. of Corr. Servs*., No. 11-CV-0152, 2015 WL 6644112, at *7 (W.D.N.Y. June 30, 2015) (citing *Garcia v. Witkowski*, 988 F. Supp. 2d 360, 361 (W.D.N.Y. 2013)), *report and recommendation adopted in pertinent part by* 2015 WL 6641471 (W.D.N.Y. Oct. 28, 2015); *Shell v. Brun*, 585 F. Supp. 2d 465, 469-70 (W.D.N.Y. 2008) ("In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety. Mere negligence (for example if a prison guard should know of a risk but does not) is not enough . . . .").

At this stage of the proceeding, and mindful of the Second Circuit's directive that a pro

44

se plaintiff's pleadings must be liberally construed, the Court finds that each of plaintiff's Eighth Amendment failure-to-protect claims survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 7.  Conditions-of-Confinement Claims

The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety."  *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981).  To demonstrate that the conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element.  *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference."  *Wilson*, 501 U.S. at 303-04.

At this stage of the proceeding, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, the Court finds the following conditions-of-confinement claims survive sua sponte review and require a response: (1) plaintiff's conditions-of-confinement claims against defendants Gravlin, Uhler, Bishop, Sergeant Jane Doe, Martin, Marshall, Sturgen, and Veneske based on unhygienic conditions, inadequate heating and clothing, and inadequate sleeping accommodations; (2) plaintiff's

conditions-of-confinement claims against defendants Uhler, Bishop, and Annucci based on excessive restrictive confinement in the SHU from August 1, 2021 to April 12, 2022; and (3) plaintiff's conditions-of-confinement claims against defendants Martin, Uhler, Rodriguez, Terriah, Bishop, LaPlant, Stickney, and Annucci based on excessive restrictive confinement in the RRU.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

The Court, however, reaches a different conclusion with respect to plaintiff's conditions-of-confinement claims against (1) defendant Sturgen based on this official allegedly forcing plaintiff to quarantine in his cell for fourteen days in July, 2021 and October, 2021, and (2) defendant Annucci based on this official allegedly providing plaintiff with an inadequate diet between 2019 and 2023.

With respect to defendant Sturgen, the Court has no basis to plausibly infer that forcing plaintiff to quarantine in his cell on two separate occasions for fourteen days deprived him of a basic human need.  Furthermore, even assuming the quarantine hold subjected plaintiff to an objectively serious condition, the complaint is devoid of allegations which plausibly suggest that defendant Sturgen's decision was made out of deliberate indifference to plaintiff's health and safety (as opposed to out of a desire to reduce the potential spread of COVID-19).  Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Sturgen is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

With respect to plaintiff's claim against defendant Annucci based on the meal plan offered to plaintiff since 2019, the complaint generically alleges that plaintiff is on a

46

"meatless" meal plan, which "lacks the necessary daily protien [sic], vitamins and minerals[,]" and "uses soy more than the daily 25 grams recommended by the Food and Drug Administration[.]"  Compl., ¶¶ 344-345.  The complaint further alleges that as a result of the meal plan, plaintiff "has suffered from low good cholesterol and vitamin D deficiency[.]"  *Id.*, ¶ 346.

As an initial matter, the complaint fails to explain how plaintiff knows that he suffers from "low good cholesterol and [a] vitamin D deficiency[,]" the severity of these alleged deficiencies, or when in relation to plaintiff's current diet he began suffering these deficiencies.  Moreover, the complaint fails to allege facts which plausibly suggest that these deficiencies have impaired plaintiff's daily functioning, or present any long-term health problems, and the Court has no basis to plausibly infer from the allegations in the complaint that the food items offered to plaintiff are not available to the general public for consumption based on health and safety concerns.  Thus, plaintiff has failed to adequately allege that his meal plan – which is presumably offered to other inmates as well – presents a known risk to his health.  *See, e.g., Mejia v. Goord*, No. 9:03-CV-124 (LEK/DEP), 2005 WL 2179422, at *6 (N.D.N.Y. Aug. 156, 2005) (noting that "the Eighth Amendment does not elevate to constitutional significance an inmate's dislike for the food served or the portions received"); *Collado v. Sposato*, No. 12-CV-2151, 2012 WL 3113837, at *4 (E.D.N.Y. July 25, 2012) ("Preference for certain foods and dislike of others cannot be equated with a constitutional guarantee to a custom-tailored menu."); *Mitchell v. New York State Dep't of Corr. Servs*., No. 6:06-CV-6278, 2012 WL 6204205, at *12 (W.D.N.Y. Dec. 12, 2012) (dismissing as frivolous prisoner's claim that a soy-based diet causes cancer).

Furthermore, the complaint does not allege that any medical professionals have expressed concerns for plaintiff's health based on his diet, or that plaintiff has sought treatment to address any health-related concerns stemming from his diet.  In addition, the complaint fails to explain why plaintiff has only been offered a "meatless" meal plan since 2019 if he wishes to consume meat, or how the diet offered to plaintiff is a "cost saving measure[.]"  Thus, the Court also has no basis to plausibly infer from the allegations in the complaint that defendant Annucci knew that plaintiff was (or has been) suffering from a nutritionally inadequate diet, yet has continued to deprive plaintiff of alternative meal options, i.e., has acted with deliberate indifference to plaintiff's dietary needs.

Accordingly, plaintiff's Eighth Amendment conditions-of-confinement claim against defendant Annucci based on the meal plan offered to plaintiff since 2019 is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 8. Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment.  *Estelle*, 429 U.S. at 102, 104.  "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104).  "The standard of deliberate indifference includes both subjective and objective components."  *Id*.

"First, the alleged deprivation must be, in objective terms, sufficiently serious."

48

*Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries[:] [1] . . . whether the prisoner was actually deprived of adequate medical care[; and 2] . . . whether the inadequacy in medical care is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (citations omitted).

The first inquiry under the objective component requires examining "whether the prisoner was actually deprived of adequate medical care." *Salahuddin*, 467 F.3d at 279. Prison officials who act "reasonably" in response to an inmate's health risk will not be found liable because the official's duty is only to provide "reasonable care." *Id.* at 279-80 (citing *Farmer*, 511 U.S. at 844-47).

The second inquiry under the objective component requires examining whether the purported inadequacy in the medical care is "sufficiently serious." *Salahuddin*, 467 F.3d at 280. If the "unreasonable care" consists of a failure to provide any treatment, then the court must examine whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). A condition is "sufficiently serious" in objective terms if it presents "a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

With respect to the subjective component of a medical indifference claim, a plaintiff must show that the defendant "act[ed] with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate

49

health or safety." *Farmer*, 511 U.S. at 837; *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'").

At this stage of the proceeding, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's medical indifference claims against defendants Dumas, Gravell, Jane Doe #1 and Jane Doe #2 survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 9. Disciplinary Due Process Claims

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process.  *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)).  Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest.  *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*.  The Second Circuit generally takes the position that normal confinement in a segregated housing

unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin*.  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)).

The "atypicality" inquiry under *Sandin* is normally a question of law.  *Colon*, 215 F.3d at 230-31; *Sealey*, 197 F.3d at 585.  In making that determination the Court must consider the specific circumstances of the confinement, including both the duration and the conditions thereof.  *Id.*

Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, general guidelines have been defined.  *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).  The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under *Sandin*.  *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey*, 197 F.3d at 589-90).[7]  As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship."  *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65 ("Where the plaintiff was confined for an intermediate duration -- between 101 and 305 days -- 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is

---

[7]  A New York state inmate confined in SHU is placed in a solitary confinement cell for 23 hours a day. The inmate may exercise in the yard for one hour each day; is limited to two showers a week; and may not work or attend programming.  *See Colon*, 215 F.3d at 230; N.Y. Comp. Codes R. & Regs., tit. 7, §§ 304.1-.14 (2008).

51

required." (citing *Colon*, 215 F.3d at 232).

Under some circumstances, separate restrictive confinement sentences can be aggregated for purposes of determining whether there is a protected liberty interest. *See Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001). To determine whether such sentences should be aggregated for this purpose, "the precise issue . . . is whether the disciplinary confinements in question constitute a 'sustained' period of confinement[.]" *Taylor v. Artus*, No. 05-CV-271, 2007 WL 4555932, at *8 (N.D.N.Y. Dec. 19, 2007). Generally, "it appears from Second Circuit decisions that separate SHU sentences constitute a 'sustained' period of confinement when (1) they are contiguous and (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions." *Id.* (collecting cases).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563- 67 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

In this case, the complaint asserts due process claims based on the First Disciplinary Hearing, the Second Disciplinary Hearing, the Third Disciplinary Hearing, the Fourth Disciplinary Hearing, the Fifth Disciplinary Hearing, and the Sixth Disciplinary Hearing. *See*

*generally*, Compl.

### a. The First Disciplinary Hearing

According to the complaint, on or about November 1, 2021, plaintiff was issued two misbehavior reports charging him with, among other things, two sex offenses based on allegations that he made sexually charged statements to two corrections officials in response to their orders.  Compl., ¶¶ 187-189.  On November 9, 2021, defendant S. Martin presided over the First Disciplinary Hearing, found plaintiff guilty of all charges except interference in the first report and violent conduct in the second report, and sentenced plaintiff to 90 days confinement in the SHU.  *Id.*, ¶¶ 190-194.

The complaint alleges that the charged misconduct, which included making sexually explicit statements to a corrections officer, did not constitute a sex offense, and defendant Martin's guilty determination was "not supported by 'some reliable evidence.'" Compl., ¶¶ 190-191.  However, the complaint fails to include any details from which this Court might plausibly infer that the guilty determination was not supported by some reliable evidence.  Indeed, the complaint is devoid of any allegations regarding the documentary evidence considered, and the witnesses who testified, during plaintiff's disciplinary hearing. Furthermore, plaintiff does not deny that he refused direct orders issued by a sergeant and made sexually explicit statements to the official as charged.

Simply put, even assuming that the disciplinary sanction triggered a liberty interest, the Court has no basis to plausibly infer that plaintiff was denied the process to which he was entitled during the First Disciplinary Hearing.  Accordingly, plaintiff disciplinary due process claims related to the First Disciplinary Hearing are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be

53

granted.

### b.  Remaining Disciplinary Hearings

With respect to the Second Disciplinary Hearing, the Third Disciplinary Hearing, the Fourth Disciplinary Hearing, the Fifth Disciplinary Hearing, and the Sixth Disciplinary Hearing, the complaint does not include any allegations regarding these hearings, let alone allegations which plausibly suggest that plaintiff was denied the process to which he was entitled during any of them.  Thus, plaintiff has failed to adequately allege that he suffered a violation of his due process rights in connection with any of the other disciplinary hearings referenced in the complaint.

Accordingly, plaintiff's disciplinary due process claims related to the Second Disciplinary Hearing, the Third Disciplinary Hearing, the Fourth Disciplinary Hearing, the Fifth Disciplinary Hearing, and the Sixth Disciplinary Hearing are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.[8]

### 10.  Due Process Claims Based on Denial of Telephone Privileges

The complaint alleges that defendants Veneske and Gravlin denied plaintiff weekly phone calls on four separate occasions between July and December, 2021.  *See* Compl., ¶ 297.  At the time, plaintiff was confined in the SHU, and New York Correction Law § 137 was not in effect.[9]  Furthermore, the law is well-settled that "[a] prisoner's access to family and

---

[8]  Insofar as the complaint alleges that the disciplinary sentences imposed with respect to each of the six disciplinary hearings was grossly disproportionate to the charged offenses, these allegations form the basis of plaintiff's Eighth Amendment claims for excessive restrictive confinement in the RRU.

[9]  This statute, which became effective on March 31, 2022, states, among other things, that "[w]ithin twenty-four hours of disciplinary confinement . . . and at weekly intervals thereafter for the duration of such

(continued...)

friends via telephone may be restricted so long as the prisoner has some other avenue to communicate, even if less than ideal." *See Fox v. Lee*, No. 9:15-CV-0390 (TJM/CFH), 2016 WL 11807252, at *5 (N.D.N.Y. Dec. 19, 2016) (collecting cases).

Here, plaintiff does not allege that he was altogether denied all forms of communication with the outside world at any point during his confinement in the SHU, let alone during the four weeks that he was allegedly denied his weekly phone calls. Thus, the Court does not construe the complaint to assert a cognizable Section 1983 claim based on the alleged phone deprivations. *See Fox*, 2016 WL 11807252, at *5; *see also Martinez v. Healey*, No. 14-CV-302, 2014 WL 5090056, at *3 (S.D.N.Y. Oct. 10, 2014) (noting that "inmates have no right to unlimited telephone calls" and that "phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel" (alteration and internal quotation marks omitted)); *Edwards v. Horn*, No. 10-CV-6194, 2012 WL 760172, at *5 (S.D.N.Y. Mar. 8, 2012) ("Because inmates have no right to unlimited telephone calls, [the plaintiff] must, but fails to, allege that he was stripped of alternate methods of communication to state a violation of his constitutional rights" (alterations, citation, and internal quotation marks omitted)); *Henry v. Davis*, No. 10-CV-7575, 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) ("Phone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world, and particularly with counsel."), *report and recommendation adopted by* 2011 WL 5006831 (S.D.N.Y. Oct. 20,

---

[9](...continued)
confinement, an incarcerated individual shall be permitted to make at least one personal phone call, except when to do so would create an unacceptable risk to the safety and security of incarcerated individuals or staff." *See* N.Y Corr. Law § 137(6)(g).

2011).

Accordingly, plaintiff's due process claims against defendants Gravlin and Veneske based on denying him access to phone calls are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 11. Due Process Claims Based on Conditions of RRU Confinement

Aside from challenging the disciplinary determinations that resulted in his placement in the RRU, plaintiff challenges both the restrictive nature of his confinement in the RRU, and the extended duration of this confinement.  More specifically, the complaint alleges that plaintiff (1) was limited to two hours of out-of-cell programming and subjected to other restrictions throughout his confinement in the RRU, which began on April 12, 2022, (2) was deprived of a rehabilitation plan throughout his confinement in the RRU, which prevented him from obtaining early release, and (3) is scheduled to remain in the RRU for more than one year, despite New York law prohibiting such a restrictive confinement period.  Compl., ¶¶ 303-373.  According to plaintiff, pursuant to New York Correction Law § 137, he has a liberty interest in accessing the programs, services, privileges, and rehabilitation plan that he was denied, among other things.  *Id.*

"A liberty interest under the Fourteenth Amendment arises either directly from the Due Process Clause itself or from a state's laws."  *Galloway v. Suffolk Cnty. Corr. Facility*, 232 F. Supp. 2d 4, 8 (E.D.N.Y. 2002) (citing *Klos v. Haskell*, 48 F.3d 81, 86 (2d Cir. 1995)).  "For a liberty interest to be conferred by the state, two requirements must be met: (1) the state must have articulated specified substantive predicates which limit the discretion of state officials;

56

and (2) it must have employed explicitly mandatory language, requiring state officials to follow those substantive predicates." *Klos*, 48 F.3d at 87 (internal quotation marks and citations omitted).

Section 6 of New York Correction Law § 137, which became effective on March 31, 2022, provides, in pertinent part, as follows:

> 6. Except as provided in paragraphs (d) and (e) of this subdivision, the superintendent of a correctional facility may keep any incarcerated individual confined in a cell or room, apart from the accommodations provided for incarcerated individuals who are participating in programs of the facility, for such period as may be necessary for maintenance of order or discipline, but in any such case the following conditions shall be observed:
> . . .
>
> (j) (i) All segregated confinement and residential rehabilitation units shall create the least restrictive environment necessary for the safety of incarcerated persons, staff, and the security of the facility.
>
> (ii) Persons in segregated confinement shall be offered out-of-cell programming at least four hours per day, including at least one hour for recreation. Persons admitted to residential rehabilitation units shall be offered at least six hours of daily out-of-cell congregate programming, services, treatment, recreation, activities and/or meals, with an additional minimum of one hour for recreation. Recreation in all residential rehabilitation units shall take place in a congregate setting, unless exceptional circumstances mean doing so would create a significant and unreasonable risk to the safety and security of other incarcerated persons, staff, or the facility. Persons in segregated confinement and residential rehabilitation units shall be offered programming led by program or therapeutic staff five days per week, except on recognized state legal holidays. All other out-of-cell time may include peerled programs, time in a day room or out-of-cell recreation area with other people, congregate meals, volunteer programs, or other congregate activities.
>
> (iii) No limitation on services, treatment, or basic needs such as clothing, food and bedding shall be imposed as a form of punishment. If provision of any such services, treatment or basic needs to an individual would create a significant and unreasonable risk to the safety and security of incarcerated persons, staff, or the facility, such services, treatment or basic needs may be withheld until it reasonably appears that the risk has

ended. . . .

(iv) Upon admission to a residential rehabilitation unit, program and mental health staff shall administer assessments and develop an individual rehabilitation plan in consultation with the resident, based upon his or her medical, mental health, and programming needs. Such plan shall identify specific goals and programs, treatment, and services to be offered, with projected time frames for completion and discharge from the residential rehabilitation unit.

(v) An incarcerated person in a residential rehabilitation unit shall have access to programs and work assignments comparable to core programs and types of work assignments in general population. Such incarcerated persons shall also have access to additional out-of-cell, trauma-informed therapeutic programming aimed at promoting personal development, addressing underlying causes of problematic behavior resulting in placement in a residential rehabilitation unit, and helping prepare for discharge from the unit and to the community.

(vi) If the department establishes that a person committed an act defined in subparagraph (ii) of paragraph (k) of this subdivision while in segregated confinement or a residential rehabilitation unit and poses a significant and unreasonable risk to the safety and security of other incarcerated persons or staff, the department may restrict such person's participation in programming and out-of-cell activities as necessary for the safety of other incarcerated persons and staff. If such restrictions are imposed, the department must provide at least four hours out-of-cell time daily, including at least two hours of therapeutic programming and two hours of recreation, and must make reasonable efforts to reinstate access to programming as soon as possible. In no case may such restrictions extend beyond fifteen days unless the person commits a new act defined herein justifying restrictions on program access, or if the commissioner and, when appropriate, the commissioner of mental health personally reasonably determine that the person poses an extraordinary and unacceptable risk of imminent harm to the safety or security of incarcerated persons or staff. Any extension of program restrictions beyond fifteen days must be meaningfully reviewed and approved at least every fifteen days by the commissioner and, when appropriate, by the commissioner of mental health. Each review must consider the impact of therapeutic programming provided during the fifteen-day period on the person's risk of imminent harm and the commissioner must articulate in writing, with a copy provided to the incarcerated person, the specific reason why the person currently poses an extraordinary and unacceptable risk of imminent harm to the safety or security of incarcerated persons or staff. In no case may restrictions imposed by the commissioner extend

beyond ninety days unless the person commits a new act defined herein justifying restrictions on program access.

(m) (i) Any sanction imposed on an incarcerated person requiring segregated confinement shall run while the person is in a residential rehabilitation unit and the person shall be discharged from the unit before or at the time such sanction expires. If a person successfully completes his or her rehabilitation plan before the sanction expires, the person shall have a right to be discharged from the unit upon such completion.

(ii) If an incarcerated person has not been discharged from a residential rehabilitation unit within one year of initial admission to such a unit or is within sixty days of a fixed or tentatively approved date for release from a correctional facility, he or she shall have a right to be discharged from the unit unless he or she committed an act listed in subparagraph (ii) of paragraph (k) of this subdivision within the prior one hundred eighty days and he or she poses a significant and unreasonable risk to the safety or security of incarcerated persons or staff. In any such case the decision not to discharge such person shall be immediately and automatically subjected to an independent review by the commissioner and the commissioner of mental health or their designees. A person may remain in a residential rehabilitation unit beyond the time limits provided in this section if both commissioners or both of their designees approve this decision. In extraordinary circumstances, a person who has not committed an act listed in subparagraph (ii) of paragraph (k) of this subdivision within the prior one hundred eighty days, may remain in a residential rehabilitation unit beyond the time limits provided in this section if both the commissioner and the commissioner of mental health personally determine that such individual poses an extraordinary and unacceptable risk of imminent harm to the safety or security of incarcerated persons or staff.

(iii) There shall be a meaningful periodic review of the status of each incarcerated person in a residential rehabilitation unit at least every sixty days to assess the person's progress and determine if the person should be discharged from the unit. Following such periodic review, if the person is not discharged from the unit, program and mental health staff shall specify in writing the reasons for the determination and the program, treatment, service, and/or corrective action required before discharge. The incarcerated person shall be given access to the programs, treatment and services specified, and shall have a right to be discharged from the residential rehabilitation unit upon the successful fulfillment of such requirements.

(iv) When an incarcerated person is discharged from a residential

59

> rehabilitation unit, any remaining time to serve on any underlying
> disciplinary sanction shall be dismissed. If an incarcerated person
> substantially completes his or her rehabilitation plan, he or she shall have
> any associated loss of good time restored upon discharge from the unit

In light of the foregoing statutory language, and mindful of the Second Circuit's directive that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's due process claims against defendants Stickney, Bishop, Uhler, Gravlin, Veneske, and Annucci related to restrictions imposed with respect to his RRU confinement survive sua sponte review and require a response.  In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 12. Conspiracy Claims

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors . . .; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  A plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy . . . [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations omitted).  Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002); *see also Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.").

The complaint asserts conspiracy claims against defendants Tyler, Phillips, Osborn,

60

Robare, Keleher, Harmer, Gravlin, Hooper, and McGee.  Compl. at 44-45.

    As an initial matter, the complaint is devoid of any details regarding an agreement entered into between two or more of the named defendants to violate plaintiff's constitutional rights.  For example, the complaint lacks any allegations which plausibly suggest that any of the named defendants involved in the alleged use-of-force incidents or housing plaintiff with an inmate who assaulted him, agreed, in advance, to subject plaintiff to physical harm.  In any event, plaintiff's excessive force and failure-to-intervene claims against defendants Tyler, Phillips, Osborn, Robare, Keleher, Harmer, and Gravlin have survived sua sponte review, and plaintiff need not establish that these officials agreed in advance to violate his constitutional rights in order to succeed on these claims.  *See Clark v. City of Oswego*, No. 5:03-CV-202 (NAM/DEP), 2007 WL 925724, at *7 (N.D.N.Y. Mar. 26, 2007) ("A plaintiff asserting a Section 1983 conspiracy claim must first prove a violation of the underlying constitutional right, . . ., or in other words, a civil conspiracy claim do[es] not set forth an independent cause of action but rather is sustainable only after an underlying tort claim has been established[.]" (internal quotation marks and citations omitted)); *see also Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009), as amended (Oct. 7, 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails."); *DeStefano v. Duncanson*, No. 08-CV-3419, 2011 WL 651452, at *4 (S.D.N.Y. Feb. 10, 2011) ("A Section 1983 conspiracy claim against private individuals will stand 'only insofar as the plaintiff can prove the sine qua non of a § 1983 action: the violation of a federal right.'" (quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)).  Furthermore, insofar as plaintiff asserts conspiracy claims against defendants Hooper and McGee based on allegations that these officials prepared false reports regarding the Third

Assault in an effort to "conceal" the wrongdoing, Compl., ¶¶ 23, the alleged creation of false reports by officials who were not present during the alleged use-of-force incident is not enough to plausibly suggest participation in an agreement to violate plaintiff's constitutional rights.  *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (dismissing the plaintiff's conspiracy claim arising from allegations that the defendants conspired to retaliate against him by filing a false misbehavior report); *Lewis v. Havernack*, No. 9:12-CV-0031 (GLS/DEP), 2013 WL 1294606, at *11 (N.D.N.Y. Mar. 28, 2013) ("Here, the allegation that defendants Chapman and Imfeld conspired to file a false misbehavior report against plaintiff is not cognizable under section 1983 because plaintiff has no general constitutional right to be free from being falsely accused in a misbehavior report."), *report and recommendation adopted by* 2013 WL 1294592 (N.D.N.Y. Mar. 28, 2013).

Accordingly, plaintiff's conspiracy claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

## IV.    PRELIMINARY INJUNCTION MOTION

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood  of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'"  *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)).  However, when the moving

party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)).  A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n.4) (internal quotation marks omitted)); *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim).  The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at * 2 (E.D.N.Y. Jul. 31, 2008).  The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

Plaintiff's request for injunctive relief seeks an order enjoining defendants Annucci, Uhler, Bishop, and Dumas from (1) assigning officials "involved in assaulting plaintiff from assuming a post or supervising an area where plaintiff is located," (2) "assigning plaintiff to double-bunk cells or having [him] remain in a double-cell [for] more than 60 days unless he volunteer[s]," (3) "continuing plaintiff's confinement in the RRU[,]" and (4) "denying [him] medical care[.]"  *See* Preliminary Injunction Motion at 1.

63

After plaintiff filed his motion, he notified the Court in another one of his pending actions that he has been transferred to Great Meadow Correctional Facility. *See Bradshaw v. Annucci*, Dkt. No. 150.

In light of plaintiff's transfer, and the absence of any credible evidence that he is likely to continue suffering, at his new facility, the same alleged harm that forms the basis of his Preliminary Injunction motion, his request for injunctive relief is denied as moot. *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.").

## V.     CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's application for leave to proceed IFP (Dkt. No. 2) is **GRANTED** in accordance with 28 U.S.C. § 1915(g) because plaintiff has made a preliminary showing that he is entitled to the "imminent danger" exception; and it is further

**ORDERED** that the Clerk provide the Superintendent of the facility designated by plaintiff as his current location with a copy of plaintiff's inmate authorization form (Dkt. No. 3), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk is directed to update the docket to add any officials

identified herein as defendants who are not currently recognized as such; and it is further

**ORDERED** that the following claims **SURVIVE** sua sponte review: (1) plaintiff's

retaliation claims against defendants Osborn, Bailey, Menard, Trombley, Marshall, Keleher,

Plonka, Gettman, Gravlin, Bishop, Mitchell, Fletcher, Veneske, Rowe, Lamica, and Keating

(i.e., each of plaintiff's retaliation claims other than the Second Retaliation Claim against

defendant Locke, the Third Retaliation Claim, the Seventh Retaliation Claim, the Twelfth

Retaliation Claim, and the Fifteenth Retaliation Claim); (2) plaintiff's mail tampering claims

against defendants Lamica, Locke, Keating, Lord, John Doe #6, and Ayer; (3) plaintiff's free

exercise claims against defendants Bishop, Stickney, Uhler, and Annucci based on the

denial of congregate services and religious meals; (4) plaintiff's excessive force and

failure-to-intervene claims against defendants Osborn, Corrections Sergeant John Doe #1,

Phillips, Tyler, Menard, Bailey, Trombley, Cymbrak, Mitchell, Chase, Marshall, Gettman,

Morrison, Corrections Sergeant John Doe #2, Corrections Officer John Doe #3, Gravlin,

Robare, Carter, Corrections Officer John Doe #4, Plonka, Keleher, and Harmer (i.e., the

excessive force and failure-to-intervene claims related to each of the ten assaults identified in

the recitation of facts); (5) plaintiff's failure-to-protect claims against defendants McQuinn,

Waite, Bishop, Uhler, Fletcher, Osborn, Rowe, Veneske, Nichols, Holmes, Annucci, Keleher,

Debyah, Gravlin, North, Harrigan, Classification and Movement Corrections Officers John

Doe #1 and John Doe #2, Orbegozo, Corrections Sergeant John Doe #1, Plonka, Gettman,

Carter, Sturgen, Lewis, Sharpe, Dumas, Hollenbeck, DeCosse, Gordon, and Jubert (i.e., the

failure-to-protect claims related to each of the nine inmate assaults identified in the recitation

of facts); (6) plaintiff's conditions-of-confinement claim against defendant Gravlin based on inadequate heating in plaintiff's housing unit between September 25 and October 2, 2021; (7) plaintiff's conditions-of-confinement claim against defendants Austin Martin and Marshall based on defendant Martin removing plaintiff's mattress from his cell, with approval from defendant Marshall, from December 6 to December 11, 2021; (8) plaintiff's conditions-of-confinement claim against defendant Corrections Sergeant Jane Doe based on this official "compell[ing] plaintiff to remain outside to stand in the freezing cold weather for about five or six hours while the officers and defendant Jane Doe remained inside the facility or on the bus with other prisoners[,]"; (9) plaintiff's conditions-of-confinement claim against defendants Gravlin, Veneske, Uhler, and Bishop based on these officials denying plaintiff in-cell cleaning supplies between April and September, 2022, and December, 2022 and January, 2023; (10) plaintiff's conditions-of-confinement claims against defendants Uhler, Bishop, and Annucci based on excessive restrictive confinement in the SHU from August 1, 2021 to April 12, 2022; (11) plaintiff's conditions-of-confinement claims against defendants S. Martin, Uhler, Rodriguez, Terriah, Bishop, LaPlant, Stickney, and Annucci based on excessive restrictive confinement in the RRU; (12) plaintiff's medical indifference claims against defendants Dumas, Gravell, Jane Doe #1, and Jane Doe #2; and (13) plaintiff's due process claims against defendants Stickney, Bishop, Uhler, Gravlin, Veneske, and Annucci based on the nature of his confinement in the RRU; and it is further

ORDERED that all remaining Section 1983 claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim

upon which relief may be granted;[10] and it is further

ORDERED that the Preliminary Injunction Motion (Dkt. No. 4) is **DENIED without prejudice** as set forth above; and it is further

ORDERED that the Clerk shall **TERMINATE** the following individuals as defendants in this action: Hastings, Peterson, Spinner, Hooper, McGee, and John Doe #5; and it is further

ORDERED that upon receipt from plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the complaint, to the United States Marshal for service upon defendants Osborn, Bailey, Menard, Trombley, Marshall, Keleher, Plonka, Gettman, Gravlin, Bishop, Mitchell, Fletcher, Veneske, Rowe, Lamica, Keating Locke, Lord, Ayer, Stickney, Uhler, Annucci, Phillips, Tyler, Cymbrak, Chase, Morrison, Robare, Carter, Harmer, McQuinn, Waite, Nichols, Holmes, Debyah, North, Harrigan, Orbegozo, Sturgen, Lewis, Sharpe, Dumas, Hollenbeck, DeCosse, Gordon, Jubert, Austin Martin, S. Martin, Rodriguez, Terriah, LaPlant, Dumas, and Gravell.[11]  The Clerk shall forward a copy of the summons and complaint by electronic mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

ORDERED that a response to the complaint be filed by defendants Osborn, Bailey, Menard, Trombley, Marshall, Keleher, Plonka, Gettman, Gravlin, Bishop, Mitchell, Fletcher,

---

[10]  Should plaintiff seek to pursue any of the claims dismissed without prejudice, including any claim dismissed against a terminated defendant, he must file an amended complaint.  Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised.  Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.  Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure.

[11]  Summonses will not issue for the "Doe" defendants because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

Veneske, Rowe, Lamica, Keating Locke, Lord, Ayer, Stickney, Uhler, Annucci, Phillips, Tyler, Cymbrak, Chase, Morrison, Robare, Carter, Harmer, McQuinn, Waite, Nichols, Holmes, Debyah, North, Harrigan, Orbegozo, Sturgen, Lewis, Sharpe, Dumas, Hollenbeck, DeCosse, Gordon, Jubert, Austin Martin, S. Martin, Rodriguez, Terriah, LaPlant, Dumas, and Gravell, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that plaintiff must take reasonable steps to ascertain the identity of the remaining "Doe" defendants and, when identified, seek to amend the complaint to add these individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

Dated: July 24, 2023
    Albany, NY

Mae A. D'Agostino
U.S. District Judge

68